UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| GERALD COHEN., and SOPHIE COHEN, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) Case No. 4:22-cv-00449 – RLW ) |
| AUTOMATED BENEFIT SERVICES, INC., BLUE CROSS and BLUE SHIELD of MICHIGAN, ASCENSION HEALTH ALLIANCE, and the ASCENSION SMARTHEALTH MEDICAL PLAN | ) ) ) ) ) ) |
| Defendants. | ) ) |

## AMENDED COMPLAINT

Plaintiffs Gerald Cohen ("Gerald") and Sophie Cohen ("Sophie"), through their undersigned counsel, complain and allege against Defendants Automated Benefit Services, Inc. ("ABS"), Blue Cross and Blue Shield of Michigan ("BCBSMI"), Ascension Health Alliance ("Ascension") and the Ascension SmartHealth Medical Plan ("the Plan") as follows:

## PARTIES, JURISDICTION AND VENUE

1. Gerald and Sophie are natural persons residing in Oakland County, Michigan. Gerald is Sophie's father.

2. BCBSMI is an independent licensee of the nationwide Blue Cross and Blue Shield network of providers. BCBSMI performed third-party claims administration services for Ascension and the Plan and acted as a fiduciary under ERISA for the Plan during the treatment at issue in this case.

3. At times, Ascension also relied on ABS for third party claims administration services.

1

4. At all relevant times BCBSMI and ABS acted as agents for the Plan and Ascension.

5. Ascension is the designated administrator for the Plan.

6. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Gerald was a participant in the Plan and Sophie was a beneficiary of the Plan at all relevant times. Gerald and Sophie continue to be participants and beneficiaries of the Plan.

7. Sophie received medical care and treatment at Fulshear Treatment to Transition ("Fulshear") from July 1, 2019, to August 21, 2020. Fulshear is a treatment facility located in Texas, which provides sub-acute inpatient residential treatment and transitional living services to adolescents with mental health, behavioral, and/or substance abuse problems.

8. BCBSMI and ABS denied claims for payment of Sophie's medical expenses in connection with her treatment at Fulshear.

9. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

10. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and because a September 9, 2022, order from the District of Utah identified the Eastern District of Missouri as the appropriate venue.

11. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), for an award of statutory damages against Ascension pursuant to 29 U.S.C. §1132(c)

based on the failure of the agents of Ascension, the Plan administrator, to produce within 30 days documents under which the Plan was established or operated, an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### Fulshear

12. Sophie was admitted to Fulshear on July 1, 2019, in large part due to complications from an eating disorder which was not able to be managed at other levels of care.

13. On December 26, 2020, Sophie's mother ("Karen") submitted an appeal stating that BCBSMI had processed the claims for Sophie's treatment both incorrectly and inconsistently. She documented this in a table which showed the following information:

| Dates of Service | Billed Amount | Allowed Amount | Percentage Allowed |
|---|---|---|---|
| 12/03/19-12/31/19 | $20,590 | | Unprocessed |
| 01/01/20-01/15/20 | $10,650 | | Unprocessed |
| 01/16/20-01/31/20 | $11,360 | $710 | 6% |
| 02/01/20-02/29/20 | $20,590 | $5,742 | 28% |
| 03/01/20-03/15/20 | $10,650 | $710 | 7% |
| 03/16/20-03/31/20 | $11,360 | $710 | 6% |
| 04/01/20-04/15/20 | $10,650 | $710 | 7% |
| 04/16/20-04/30/20 | $10,650 | $710 | 7% |
| 05/01/20—05/15/20 | $10,650 | $710 | 7% |
| 05/16/20-05/31/20 | $9,940 | | Unprocessed |
| 06/01/20-06/16/20 | $11,360 | | Unprocessed |

3

| | | | |
|---|---|---|---|
| 06/17/20-06/30/20 | $9,940 | | Unprocessed |
| 07/01/20-07/15/20 | $10,650 | | Unprocessed |
| 07/16/20-07/30/20 | $11,360 | | Unprocessed |
| 08/01/20-08/15/20 | $10,650 | | Unprocessed |
| 08/16/20-08/21/20 | $4,260 | | Unprocessed |

14. Karen pointed out that the way claims were processed varied drastically and BCBSMI paid as little as 6% and as much as 28% with little to no justification as to why this was done. She wrote that $710 was the daily charge for Fulshear, not the entire total. She also argued that BCBSMI could not simply choose to ignore dates of service which should have been covered.

15. Karen included another table which documented payment for Sophie's residential treatment care for dates of service between July 2019 and December 2019. She noted that compensation for these dates also varied but was largely between 55% and 68%, not the "ridiculously low" 6% and 7% rates BCBSMI had paid more recently for Sophie's transitional living treatment.

16. She argued that BCBSMI had disregarded her policy language and appeared to have determined the amounts it would pay arbitrarily. Karen wrote that if nothing else, she would expect BCBSMI to be consistent in the amounts it paid but it had not even done this. She contended that according to the terms of her insurance policy, the claims should have been paid in full at a 100% rate.

17. She stated that under ERISA she was entitled to know how the Plan's benefits were being administered and asked to be provided with clear and detailed documentation describing the exact methodology used to calculate the allowable amount for Sophie's claims.
18. Karen also requested documentation to assess the Plan's compliance with MHPAEA. She asked it to perform a MHPAEA compliance analysis paying particular attention to the methodology used to calculate reasonable and customary charges for analogous medical and surgical services.
19. Karen claimed that her appeal could not be considered untimely as it was submitted during the Covid 19 "Outbreak Period" which tolled any applicable filing limitations "until sixty (60) days after the announced end of the National Emergency or such other date announced by the Agencies in a future notification."
20. She concluded the appeal by requesting a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits she was seeking, any administrative service agreements that existed, the clinical guidelines and medical necessity criteria utilized in the determination, as well as their medical or surgical equivalents (whether or not these were used), along with any reports or opinions about the claim from any physician or other professional who reviewed it, along with their names, qualifications, and denial rates. (collectively the "Plan Documents")
21. In a letter dated March 2, 2021, ABS stated that it had reviewed the denial on behalf of the Plan and had upheld the decision to deny payment. The letter stated that the appeal was not submitted within the 180 day window allowed to appeal the adverse decision and

therefore the denial would continue to be maintained and the Plaintiffs had no further appeal rights or ability to file suit under ERISA.

22. ABS sent a second letter also dated March 2, 2021, which contradicted the above letter and gave a separate justification for the denial. The second letter stated that the claims were processed correctly and that claims for out-of-network providers were limited to the maximum payable charge as outlined in the insurance policy.

23. The letter did not specify how the maximum payable charge was calculated, nor did it specify why the amounts paid were so low and varied so substantially, even though Karen had specifically requested this information. This letter correctly stated that the Plaintiffs had further appeal rights and could seek further compensation through litigation under ERISA.

24. On April 26, 2021, Gerald and Karen submitted a level two appeal of the denial of payment for Sophie's treatment. They continued to assert that Sophie's claims had not been processed correctly and stated that they were entitled to certain protections under ERISA during the review process including:

> (1) A full, fair, and thorough review; (2) all comments, documents, records, and other information relating to our claim; (3) the specific reasons for the adverse determination including any specific plan provisions, medical criteria, and other documents utilized in making said determination; (4) the identification and credentials of any medical or vocational expert whose advice was obtained in connection with our claim (even if their advice was not relied upon in making the adverse decision); (5) a description of any additional material or information necessary for us to perfect our claim along with an explanation of why such information is necessary.

25. They wrote that thus far they had not received any meaningful responses to the arguments and evidence presented during the appeal process, including an explanation of how the allowable payment amounts were calculated. They stated that they had not received the

"productive dialogue" to which they were entitled under ERISA and had received no response to their request for a MHPAEA compliance analysis to be performed.

26. They asserted that their rights under MHPAEA had likely been violated and stated that MHPAEA compelled insurers to ensure benefits for mental health services were offered at parity with benefits for analogous medical or surgical services.

27. They argued that based on remark code N362 in several of the explanation of benefits statements they had received ("The number of Days or Units of Service exceeds our acceptable maximum") it appeared that Ascension and its agents were applying a quantitative treatment limitation in violation of MHPAEA by applying a treatment maximum on the number of days they would cover for residential treatment (even though Karen and Gerald could find no such restriction enumerated in the Plan documents) while not imposing any similar such restrictions to comparable medical or surgical services.

28. They asked that a parity compliance analysis be conducted in conjunction with the review of their appeal in order to ensure that MHPAEA was being applied properly. They asked to be provided with physical copies of the results of the analysis and any documentation used. They also requested to be provided with specific information concerning the acceptable maximum number of days limitation described in the explanation of benefits statements they received, including the specific Plan language describing that limitation and the factors used in its development.

29. They again asked to be provided with a copy of the Plan Documents.

30. On July 9, 2021, "The SmartHealth Advisory Committee" upheld the denial of payment for Sophie's treatment. The letter stated in pertinent part:

> The Committee has upheld the denial of your first-level appeal. The Plan provides, in relevant part:

Section 1.22 Covered Expenses
Costs incurred with respect to Medically Necessary covered services, supplies, and charges described in section 4.5. Covered expenses shall be limited to Allowable Amounts for Network providers and Usual, Customary, and Reasonable (UCR) Charges for Out-of-Network providers.

Section 1.86-Covered Usual, Customary, and Reasonable Charge
The dollar amount for a treatment, service, or supply provided by a health care provider that is reasonable as determined by the Plan utilizing various benchmarks, including but not limited to Medicare and independent party fee schedule data.

Section 1.21 Cost-Share

The sharing of Covered Expenses between the Plan and the Participant. When the Plan pays a percentage of the Usual, Customary and Reasonable Charge for Out-of-Network providers or the Allowable Amount for Network providers, the Cost-Share equals the Participant's balance.

Following the Plan guidelines outlined above, an independent party fee schedule was utilized in determining UCR. Schedule B BlueCard Disclosures for Out-of-Area Services, Section F1a Nonparticipating Providers Outside BCBSM's Service Area states in relevant part:

When covered healthcare services are provided outside of BCBSM's service area by nonparticipating providers, the amount an enrollee pays for such services will be based on either the Host Blue's nonparticipating healthcare provider local payment or the pricing arrangements required by applicable state law. In these situations, the enrollee may be responsible for the difference between the amount that the nonparticipating provider bills and the payment BCBSM will make for the covered services as set forth in this paragraph.

BCBSM and the local plans use an allowed amount for claims processing. This allowed amount is negotiated between the local plans and the providers. For out-of-network claims, allowed amounts are not greater than on in-network claims.

BCBSM has confirmed the local pricing for DOS 7/1/19-12/2/19 utilized per diem (per day) pricing methodology. For DOS 12/3/19-6/16/20 the local plan confirmed DRG (Diagnosis Related Grouping) pricing methodology was utilized.

According to our records, the provider is considered Out-of-Network (Tier3). The claim was processed at the appropriate benefit level based on UCR charges. There is no additional allowance above UCR allowed by the Plan and the provider may balance bill.

> As such, this appeal has been denied pursuant to l5113. This code has the following meaning: The charge is over the Blue Cross approved amount for participating providers. You may be billed for the amount over the approved amount. The diagnosis code, treatment code, and their corresponding meanings are available upon request. Such a request for a diagnosis code, treatment code, or their corresponding meaning is not, in and of itself, a request for an internal repeal or an external review.
>
> Claims for DOS 6/17-8/21/20 were denied as "penalty for no pre cert" appropriately as the services were determined not medically necessary based on a clinical review. The reviewer stated; … "there was no clinical indication to support ongoing supervised living setting as the member had a part time job, was working on completing her schoolwork for graduation and cooperative with treatment. Therefore, the clinical criteria for supervised living was not met and the member could be transitioned to a lower level of care."

31. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

32. The denial of benefits for Sophie's treatment was a breach of contract and caused Gerald to incur medical expenses that should have been paid by the Plan in an amount totaling over $150,000.

33. After Plaintiffs had yet to receive a copy of the Plan Documents from the Defendants including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities, Plaintiffs made one last attempt to procure these materials by requesting them directly from Ascension in a January 23, 2022, letter.

34. Specifically, Gerald and Karen asked to be provided with:

- A complete copy of Sophie's claim file;
- Disclosure of the identities of all individuals with clinical or medical expertise who evaluated the treatment for our daughter, Sophie at Fulshear Treatment to Transition, copies of those individuals' *curriculum vitae*, copies of any memoranda, emails, reports, or other documents reflecting the rationale of the reviewers in denying coverage for Sophie's claim;
- A complete copy of both the medical necessity criteria utilized by the Plan, Ascension (BCBS MI), U.S. Health and Life Insurance Company, and Automated

9

> Benefit Services, Inc. in determining that Sophie wasn't covered;
> - A complete copy of the medical necessity criteria utilized by the Plan, Ascension (BCBS MI), U.S. Health and Life Insurance Company, and Automated Benefit Services, Inc. for skilled nursing facilities, sub-acute inpatient rehabilitation treatment, and inpatient hospice treatment. This is necessary to allow us to carry out an evaluation of whether the Plan has complied with the requirements of the federal Mental Health Parity and Addiction Equity Act;
> - Complete copies of any and all internal records compiled by Ascension (BCBS MI), U.S. Health and Life Insurance Company, and Automated Benefit Services, Inc. and Ascension SmartHealth Medical Plan in connection with Sophie's claim including, but not limited to, telephone logs, memoranda, notes, emails, correspondence, or any other communications;
> - A copy of the summary plan description, master plan document, certificate of insurance, insurance policy, and any other document under which Sophie's insurance plan is operated;
> - Copies of any and all administrative service agreements, contracts or other documents which described and defined the relationship, rights and obligations of and between you, the plan administrator, and Ascension (BCBS MI), U.S. Health and Life Insurance Company, and Automated Benefit Services, Inc.; and
> - Copies of documents identifying the processes, strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation with respect to medical/surgical benefits and mental health or substance use disorder benefits under the plan.

35. In a letter dated April 14, 2022, Greensfelder, Attorneys at Law stated that they represented Ascension and had made their best effort to comply with the request for documentation. The letter described its contents as:

> 1. The Claims File, marked Ascension 1-411, including:
>    - First Level Appeal Documents;
>    - Second Level Appeal Documents;
>    - Informational Request(s);
>    - External Review by Medical Review Institute of America;[1]
>    - CVs of individuals with clinical or medical expertise who evaluated the claims, Ascension [sic]; and
>    - Claims Ledgers / EOBs;
>
> 2. The medical necessity criteria and DSM-5 referenced in the Claims File, marked Ascension 412 – 437 and Ascension 1019 – 1043

---

[1] This entry was followed by a footnote which stated, "Although you did not request an external review, a review was nevertheless conducted to ensure accuracy of the determinations."

> 3. The Plan, Summary Plan Descriptions and Addenda, marked Ascension 438 – 601 and Ascension 691 – 903; and
>
> 4. The Services Agreements between Ascension and ABS and Ascension and BCBSM marked Ascension 904 – 1018. Pricing information has been redacted from the Agreements.
>
> Lastly, you have requested documents related to "a nonquantitative treatment limitation." This request is ambiguous and overly broad. We are unable to respond without more specific information detailing what you are seeking.

36. The letter noted that while no documents were produced with the numbers Ascension 602 to Ascension 690, this was the result of a numbering error and did not constitute the withholding of any relevant information.

37. The letter stated that copies of the criteria for skilled nursing facilities, sub-acute rehabilitation, and inpatient hospice had been requested but had not yet been received. The letter stated that these materials would be provided upon receipt. Plaintiffs have yet to receive any of these materials.

38. While Plaintiffs appreciate the documentation provided, establishing a violation of MHPAEA and determining the extent of any such violation cannot be done without documentation for both mental health services and their medical or surgical analogues. Plaintiffs are thus unable to fully allege the extent of any MHPAEA violation until they receive all of the materials requested, including the medical or surgical criteria for skilled nursing care, inpatient rehabilitation, and hospice.

39. In addition, Plaintiffs alleged that Defendants imposed a quantitative treatment limitation by imposing a limit to the maximum number of days allowed to be covered for Sophie's mental healthcare. Plaintiffs requested additional information regarding this treatment limitation and the factors and evidence used in its development, but these were not provided.

40. The documentation Defendants did provide included emails which explicitly acknowledged that many of the claims had not been processed correctly.

41. Puzzlingly, the notes from the review process stated that the first level appeal decision, attributed to Karen Goldberg, MD, was "based on InterQual criteria." And then immediately stated that, "If InterQual criteria was not available, the following criteria was utilized." No criteria were then listed. Plaintiffs are not aware of how the decision could have been based on InterQual criteria if such criteria were conceivably not available at the time.

42. The documentation also included an external review decision, but this does not appear to have analyzed the facts in dispute in this case. The reviewer opined that treatment was not considered medically necessary based on the documentation provided, and care could have been provided in an outpatient setting. However, as care had never been denied for this reason while the Plaintiffs were still able to appeal, the reviewer would have not possessed sufficient documentation to make a determination regarding medical necessity as none was ever submitted in the appeal process.

43. The reviewer further opined that transitional living was an excluded service, but again this was never argued in any of the denial letters and is presumably not the position of the Plan or its agents as portions of the treatment were paid for. Consequently, the external review was not only performed without the Plaintiffs' request, but it appears to have little to no actual relevance to the facts at issue in this case.

## **FIRST CAUSE OF ACTION**

**(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

44. ERISA imposes higher-than-marketplace quality standards on insurers and plan

administrators. It sets forth a special standard of care upon plan fiduciaries such as BCBSMI and ABS, acting as agents of the Plan, to discharge their duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

45. BCBSMI, ABS, and the Plan failed to provide coverage for Sophie's treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

46. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

47. The denial letters produced by Defendants do little to elucidate whether a meaningful analysis of the Plaintiffs' appeals was conducted or whether they were provided with the "full and fair review" to which they are entitled. Defendants failed to substantively respond to the issues presented in Plaintiffs' appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

48. BCBSMI, ABS, and the agents of the Plan breached their fiduciary duties to Sophie when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in Sophie's interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of Sophie's claims.

49. The actions of BCBSMI, ABS, and the Plan in failing to provide coverage for Sophie's medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

50. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first and second causes of action is specifically anticipated and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate remedies under both causes of action.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

51. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of BCBSMI's and ABS's fiduciary duties.

52. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

53. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C. §1185a(a)(3)(A)(ii).

54. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a

lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

55. The medical necessity criteria used by BCBSMI and ABS for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

56. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for Sophie's treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does BCBSMI exclude or restrict coverage through the imposition of requirements such as "[t]he number of Days or Units of Service exceeds our acceptable maximum."

57. When BCBSMI and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice. BCBSMI and the Plan evaluated Sophie's mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

58. Plaintiffs have alleged a quantitative treatment limitation based on their belief that Defendants do not restrict analogous medical or surgical treatment under the grounds that

"[t]he number of Days or Units of Service exceeds our acceptable maximum." Plaintiffs requested additional documentation to argue this with more specificity but did not receive it.

59. Plaintiffs also requested documentation to assess the Plan's level of compliance with nonquantitative treatment limitations, but likewise did not receive these materials.

60. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and BCBSMI, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

61. Despite Gerald's request that BCBSMI and the Plan conduct a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and claim administrators perform parity compliance analyses, BCBSMI and the Plan have not provided Gerald with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, Defendants have not provided Gerald with any information about the results of this analysis.

62. The violations of MHPAEA by Defendants are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

## THIRD CAUSE OF ACTION

**(Request for Statutory Penalties Against Ascension
Under 29 U.S.C. §1132(a)(1)(A) and (c))**

63. BCBSMI and ABS, acting as agents for Ascension, the administrator of the Plan, are obligated to provide to participants and beneficiaries of the Plan within 30 days after request, documents under which the Plan was established or operated, including but not limited to any administrative service agreements between the Plan, ABS, and BCBSMI, the medical necessity criteria for mental health and substance abuse and medical necessity criteria for skilled nursing and rehabilitation facilities.

64. In spite of Gerald's requests during the appeal process for BCBSMI and ABS to produce the documents under which the Plan was operated, and his instructions to forward that request to the appropriate entity if BCBSMI was not acting on behalf of Ascension in this regard, BCBSMI and ABS initially failed to produce to the Plaintiffs the documents under which the Plan was operated, including but not limited to any administrative service agreements between the Plan, ABS, and BCBSMI, the medical necessity criteria for mental health and substance abuse and medical necessity criteria for skilled nursing and rehabilitation facility treatment within 30 days after they had been requested.

65. After BCBSMI and ABS repeatedly failed to provide these materials, Plaintiffs sent one final letter dated January 23, 2022, to Ascension again requesting the documents which they were statutorily entitled to receive upon request. Ascension's counsel partially complied with this request for documents, but did not produce all of the materials requested, including the criteria for analogous medical and surgical facilities such as skilled nursing care.

66. The failure of Ascension and its agents ABS and BCBSMI, to produce the documents under which the Plan was operated, as requested by the Plaintiffs, within 30 days of Gerald's request for ERISA documents, provides the factual and legal basis under 29 U.S.C. §1132(a)(1)(A) and (c) for this Court to impose statutory penalties against Ascension up to $110 per day from 30 days from the date of each of these letters to the date of the production of the requested documents.

67. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for Sophie's medically necessary treatment at Fulshear under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. For an award of statutory penalties of up to $110 a day against Ascension after the first 30 days for each instance of Ascension and its agents ABS and BCBSMI's failure or refusal to fulfill their duties, to provide the Plaintiffs with the documents they had requested.

4. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

5. For such further relief as the Court deems just and proper.

DATED this 23rd day of September, 2022.

By    s/ Brian S. King
      Brian S. King
      Attorney for Plaintiffs

County of Plaintiffs' Residence:
Oakland County, Michigan